Judges of the United States Court of Appeals for the Second Circuit. Hear ye, hear ye, hear ye. All persons having business before this, a stated term of the United States Court of Appeals for the Second Circuit. Draw near, give your attention, and ye shall be heard. Good morning. This is Judge Katzmann, and I'm here with Judge Loyer and Judge Park. We have three cases on the orally argued calendar today. Avon Nursing, United States v. Dickinson-Cruz, and Skoric v. Saul. I understand from our courtroom deputy that everyone is here, so we will proceed in order. Each litigant will have two minutes of uninterrupted argument, and at that point, the argument, the questioning will begin, and in series, each judge will offer questions. So, the first case is Avon Nursing and Rehabilitation v. Azar. I believe Mr. Feldman meant your argument, and I understand that you will have two minutes for rebuttal. Thank you, Your Honor. May it please the Court, Brian Feldman for appellants. Congress chose to mandate that registered nurses bring their expertise to every nursing home survey. Congress rejected proposals to give states discretion or to require nurses only on annual surveys. Congress used precise statutory cross-references in a manner endorsed by five recent Supreme Court cases. The Secretary's final rule flies in the face of Congress's choice. On jurisdiction first, the Illinois Council exception permits this suit, not because an administrative law judge could not hold the final rule illegal under 405B, although one couldn't, but because a district judge couldn't do so under 405G. Ask the government, Your Honors, should a 405G district court vacate a determination made by an illegally composed survey team? If the answer remains no, then 405G's illusory offers no review at all, and the Illinois Council exception must apply. Second, there's no clear statement stripping Section 1331 jurisdiction for the Medicaid Act challenge. A clear statement from Congress is required, as this Court held in Southern New England telephone, to withdraw Section 1331 jurisdiction. Not only is there no such statement here, but to the contrary, when Congress enacted Medicare and Medicaid, it did so together in 1965, and in that Act, it chose to strip jurisdiction only for Medicare and not for Medicaid. Respecting that choice will not open the floodgates. Facilities challenging adjudications, like survey results or penalties, will still need to exhaust their administrative remedies before coming to court. Reversing here will allow formal rulemaking challenges under the Medicaid Act to proceed, as in the Seventh Circuit's Illinois Council case, but not open the floodgates to specific challenges to unexhausted adjudications, as illustrated by the Seventh Circuit's health equity case. Judge, we'll begin the questioning. Thank you. Can I ask you about the Medicaid Act claim, and in particular, the Cathedral Rock case and related cases? They seem to hold that – they express a concern about bringing claims as Medicaid claims in a way that would allow you to end-run the Medicare Act incorporation of 405H. So I guess I'm trying to understand what your response is to Cathedral Rock. Is it that the Sixth Circuit and the related cases are wrong, or is this case different in your view? So, Your Honor, a few answers to that. First, Cathedral Rock itself is about an unexhausted case where a specific adjudication did not go to the ALJ and the appellate level and went straight to court. That would come out the same here. The real circuit split for rulemaking is between Illinois Council and the Seventh Circuit and Michigan Association and the Sixth, and we submit that the Seventh Circuit got it right. The reason why is ultimately doctrinal, although I will address the policy concerns as well. Doctrinally, a clear statement is required to withdraw jurisdiction, and the Supreme Court has gone so far to say in MIMS that even if there's a rationale for stripping jurisdiction, like the Sixth Circuit purported to find, that, quote, may fit hand in glove with Congress's objective, 1331 should hold firm against mere implication. That was Justice Ginsburg in the MIMS decision. The two policy arguments that the government and the courts have seized on are, first, that these are substantially identical statutes, and second, that we're talking about duly participating facilities. Both of those arguments could not rise to the level of changing the doctrine, but they're wrong in any event. There's no textual basis for either. The substantially identical argument is anachronistic as well, right? We're asking the question of what Congress intended in 1965. The answer can't be to shield statutes that were passed in substantially identical fashion 22 years later. Also, that argument leads to an absurd result, which is a rule violating a unique Medicaid Act statute gets struck, but one that is doubly offensive and also violates Medicare is survived. There is no two wrongs make a right theory of jurisdiction. Is there any reason why Congress didn't incorporate 4 or 5H into the Medicaid Act? Is there any rationale for it? Because it does seem like it's an odd difference between the two when they're otherwise substantially the same. Yeah, that's an excellent question, Your Honor. Here's what Congress did. They didn't tell us why, but there's I think an obvious answer to the question, which is Congress took the existing 4 or 5H jurisdictional stripping provision that existed for Social Security. Social Security is 100 percent federally run. As the courts know well, Social Security beneficiaries will sue the federal government when they don't get their Social Security. The same is true of Medicare, 100 percent federally run administered program. Beneficiaries and providers alike would sue Medicare. It made sense to extend the 4 or 5H immunity or jurisdiction stripping provision from Social Security Act to Medicare. Medicaid is a very different beast. Medicaid is a state run program where beneficiaries and providers who aren't getting paid are likely to and do all the time sue the state government. So there was every reason for Congress in 1965 to put Medicare in the same bucket as another 100 percent federally run program, Social Security, and to put Medicaid in a very different – in a different bucket. This is Judge Katzmann and just a few questions. If we were to agree that we have jurisdiction over the Medicaid Act claims, then just to be clear, your position would be that we could then review the regulation without reaching the issue of our jurisdiction under the Medicare Act? That is correct, Your Honor. The regulation, the final rule was passed under the authority of both Acts, and if this court has jurisdiction under either, it has the ability to vacate the Act. That's correct. And presumably under your view, we could either, as a court, if we agreed with you, I'm not saying that we do, that there is jurisdiction over the Medicaid Act claims, we could either ourselves in the first instance perform that review or remand to the district court to perform that review. Now, my question is – my further question is this. The statute explicitly, as I read it, compels nurses, certainly with respect to an extended survey, and specifically authorizes a variety of other professions without mentioning nurses for complaint responses. Why doesn't that suggest that there are, in fact, two distinct and really not overlapping requirements that apply in different areas? Three answers, Your Honor. The first is because the cross-reference in G2E1 is precise and covers the whole subsection. The government agrees on pages 30 and 32 of their brief that if subsection – this subsection means subsection G, that includes investigative complaint surveys. The second is that the legislative history supports that reading. At the time that the conference committee decided to take up the language in G2E1, it had before it the status quo, where there was no requirement, discretion was left to the states, a House recommendation that all surveys include registered nurses, and a Senate amendment that would do what the government argues here, limit registered nurses to those annual surveys. And the conference adopted the House language to require nurses on all the surveys, so this would be a reversal of that. As to the direct conflict that the government cites with irreconcilable inconsistency, as the government says in page 32 of its brief, between G4 and G2E1, it doesn't exist. The reason the government, I submit, goes to the extreme of saying this is a direct conflict is that is the doctrine. Under Morton v. Mancari, if two provisions are capable of coexistence, the court must interpret the statute to give each effect. Here, there's no inconsistency. G4 says that a special investigative team can be put together, it's permissive, and it could include appropriate health care professionals. Why is there no conflict? Three reasons. One, it does not say there can't be a registered nurse on surveys. In fact, two, it says appropriate health care professionals, and a registered nurse is, for a survey, an appropriate health care professional. And the third reason is that the investigative team, what's governed by G4, is much broader than surveys. The Secretary's Rule of 42 CFR 48308F explains when a complaint investigation needs to trigger a survey, and it's only when a survey, and a survey alone, can determine whether a deficiency exists. In those cases, this investigation team under G4 would launch a survey, and if the team didn't include a registered nurse as a standing member, would include a registered nurse on the survey team consistent with G2E1. As to your Honor's initial rule, we would ask the court to reach this decision. You certainly have the discretion, as we've laid out in our client brief at pages 16 through 17. It's been briefed fully twice here and at the district court. It raises a pure legal question. We submit the statutory construction is the easier part of this. The jurisdiction is the more complicated one, and it would create extra burdens for the district court and ultimately another panel of this circuit were we to litigate the statutory construction later. Thank you. One last question. When I look at the statutory section here that uses the word subsection, it does it in a few different ways, and G2 in particular is at times referred to as a subsection and at other times as a paragraph. Given that, why shouldn't we conclude that the phrase under this subsection is at least ambiguous? Because the Supreme Court in Scion, Rubin, Southwest General, Coons, and Arab Anti-Discrimination Committee, so five times over, has explained that distinction, which is that when a term is used without a further qualification, something else in parenthetical that follows, it refers to all of the section or here the subsection to use the terms of Southwest General. As the Supreme Court said in Scion, the court can't quote cherry pick from the material covered by the statutory cross reference. So this isn't a case in which subsection is qualified, and that interpretation, again, moreover, is supported by the legislative history here, in particular, the legislative history at the conference committee level, which is particularly persuasive legislative history. Thank you. Judge Laudier. Thank you, Judge Katzmann. So I've got just a few questions. The first is that understanding that you think that the remedy, so to speak, here is illusory, as you put it. Is there anything that prevented Avon from going through the administrative process to challenge this final rule? Yes, Your Honor, which is the law, the case law and the administrative law. Again, we're not complaining about what would have happened at the administrative level. We know what would have happened because in the record of Joint Appendix 269, you have the results when Avon, before the final rule, contested a survey without a registered nurse. And the highest administrative level of the Secretary said that question was irrelevant to determinations. And it would be irrelevant, again, at the administrative level, but so, too, according to the government and all of its briefing to date that we've been able to find and every circuit that's reached this question, it would be irrelevant to a decision under 405G or under the CMT statute for the circuits. In terms of the final decision, what I'm asking about is the process. Is there anything that prevented Avon from going through the process, understanding that, look, it might be in one sense futile, but we've got an administrative process and we've got to go through it? I don't believe that there is any process in the regulations for any of the plaintiff facilities to bring a rulemaking challenge. The regulations here are very finely designed to permit only certain determinations, what the agency calls in the regulations initial determinations, to trigger an ALJ hearing. And a rulemaking is not an initial determination. Specific survey findings, if they're high enough level, like an immediate jeopardy finding and specific enforcement actions are the only things that can trigger the administrative review process. I would note, though, that at the time of the appeal, before the departmental appeals board, the final rule had been proposed and Avon did, in fact, brief that issue, as did CNS, before the board. And the board dismissed it because it was irrelevant, as the board says, at page 269. Now, I also understand that a vast majority of nursing facilities are dually participating facilities. Is that correct? That's not on the record, but that is my general understanding. So my understanding is that as of 2014, about 92% of all nursing facilities are dually participating facilities, and we don't quibble with that. I think the government would be in a better position to open up on that. So, and I'm thinking about Ephesian Rock, which Spark mentioned, which seems to offer or provide a more or less bright line rule with respect to all nursing facilities that are dually participating facilities. And I wonder if you could give me your thoughts about maybe a slightly different, less bright line test, which is a predominant test that looks at the nature of the challenge. So if, to the extent that the challenge is primarily, or primarily arises under the Medicare Act, then the jurisdiction stripping provisions of 405H kick in. If it's primarily a challenge under the Medicaid Act, because of the facts involved, for example, and the nature of circumstances that led to the challenge, then it's not. Now, that may not help in this case, it's not clear, but is that a possible test? Your Honor, it's a test that to some extent has been, is reflected in the divide between the Springdale convalescent case in the Fifth Circuit from 1977 and Rhode Island Hospital from 1978. And it's a test that certainly could be applied where you have, you know, 95% of the, excuse me, where you have a regulation that fails because of Medicare or a regulation that fails because of Medicaid, which is what the Springdale and Rhode Island cases were about. Only the Medicare statute made those regulations illegal in those cases, even though you had a dual or Medicaid only participant challenging. And so in that circumstance, yes, where you have two statutes that say the same thing, we've submitted, there is no predominance. Here, the particular requirement, the rule fails for equal reasons under 1819 and 1919. So I'm not sure how that test could be applied in this particular circumstance. What the Supreme Court said about what 4 or 5H means and how it should be interpreted, the arising under clause, is where the standing and substantive basis for a claim arises under a particular act. That's how you determine whether it's Medicare or Medicaid. And those cases from the Supreme Court, Illinois Council, Ringer, and Selfiad are more recent than some of these later, earlier decisions. Applying that test would mean where a home is a Medicaid regulated home, they would have standing to bring a Medicaid challenge on a substantive basis. And to the extent they also are a Medicare home and are challenging under 1819, they would arise under the Medicare 4 or 5H statute, but not otherwise. Is it your view, then, that this challenge can stand entirely on its own under the Medicaid Act? It is, Your Honor. That's correct. I would note that the Supreme Court has gone so far to say that even if courts believe Congress, had they been presented with this, would have wanted to adopt this approach, and in the Rosencrantz case, 16 U.S. 257, where the Supreme Court said, even if it were persuaded, Congress intended to strip that when it comes to subject matter jurisdiction, a case of mere omission is an omission which courts cannot supply. So at the end of the day, these policy arguments, as a matter of doctrine, cannot take the court to the position that the Sixth Circuit got in Cathedral Rock and the String Association. One of the things you mentioned in response to a question posed by one of my colleagues is the provenance, I guess, of the difference between the Medicare Act and the Medicaid Act. And it was unclear to you, Alyse, why precisely Congress did not include the jurisdiction stripping provisions of the Medicaid Act. And you alluded to the fact that Medicaid, unlike Medicare, is primarily state-run. But what are we to draw from that in connection with trying to answer this question? Is there any policy reason that the fact that the Medicaid Act and Medicaid is primarily state-run, is there any policy reason that that fact would help us understand whether there's jurisdiction in this case? Yes, Your Honor. There are various types of disputes that can lead to litigation to which 405H would apply. We're talking about a rulemaking. In some of the case law, we've looked at adjudications of enforcement action. But, of course, the primary thing Congress is probably thinking about... And those cases will be protected by 405H as well. Could you repeat your sentence? Because we lost you. Oh, I'm sorry. I have a little technical problem here. One of the main differences is that Medicaid dollars are dollars held by states. And one of the things that 405H does is it protects the Medicare program for being sued for those dollars outside of the statutory drawn mechanism. When homes sue for dollars under the Medicaid Act, they do so in state court. And I've handled some of those cases. So those cases don't threaten the federal courts and the federal government in the same way in the Medicaid program as they do in the Medicare program, which is another reason why Congress may have included 405H in Social Security and Medicare, but not in Medicaid. I see. That's very helpful. Thank you. You'll have two minutes for rebuttal, and we will now turn to Mr. Connolly. Good morning, and may it please the Court, Christopher Connolly from the U.S. Attorney's Office on behalf of the government. The District Court correctly held that it lacks jurisdiction over plaintiff's claims. We've been discussing some of the reasons for that already during this argument. The plaintiffs here are duly participating facilities. They participate in Medicare and Medicaid. And as a result, this challenge to HHS's final rule is subject to the Medicare Act's claim channeling provisions at 405G and 405H. The Sixth Circuit's decision in Cathedral Rock here is important for understanding why that's the case, and it sets forth rather succinctly the statutory and regulatory bases for finding that the claim channeling provision applies here. The Medicare and Medicaid Act impose common certification and quality of care requirements on nursing facilities. There are very few differences between them, and they're limited really to kind of state-specific issues or instances where Medicaid covers individuals who would not otherwise be covered by Medicare. Moreover, when the Secretary finds that a duly certified facility isn't in compliance with any of these requirements, its authority is to impose remedies under both the Medicare and the Medicaid Act. And the regulations provide that the appeals procedures for reviewing determinations by the Secretary apply to both participation in the Medicare program and the Medicaid program are the same procedures. For all of these reasons, as well as for the policy reason that finding otherwise would allow duly participating facilities to essentially plead their way out of the Medicare Act claim channeling provision, it's proper in a situation such as this where a claim is certainly not Medicaid-specific but is common to both Medicare and Medicaid brought by duly participating facilities to find that the claim channeling provision applies. And once those provisions apply, it's clear under Illinois Council and the Michigan Academy decision that this was a situation where the plaintiffs were required to first bring that claim to the Secretary before it could be brought in the district court. The no review exception, put simply, doesn't apply because there is no question that notwithstanding the plaintiff's ability to obtain the relief they seek at the administrative level, once those administrative proceedings were completed, they were free to come into district court at that point and make the arguments that they're attempting to make here. So for all of those reasons, the court should affirm the district court's judgment on jurisdictional grounds and, for that reason, not reach the merits. If the court does reach the merits and determines that it would adjudicate those rather than sending it back to the district court, the final rule here is entitled to Chevron deference. The language of the statute is ambiguous at best, and the interpretation set forth in the final rule is reasonable in light of the language of the statute and the statute's purpose. Judge Park. Yes, thank you, counsel. So I understand the Medicaid Act doesn't incorporate the claim channeling or the jurisdiction stripping provisions. And so your argument, I take it, is that you're asking us to infer based on out-of-circuit case law, based on essentially a policy consideration that the Medicaid Act should also import these provisions. Is that fair? It's more than just a policy consideration, Your Honor. It's inherent in the way the Medicare and Medicaid Act interact with one another, particularly with respect to duly participating facilities. The challenge here is to a final rule that interprets and governs statutes concerning surveys and investigations. Those surveys and investigations aren't split up into Medicare and Medicaid. Those are the statutes that are going to govern surveys and investigations for duly participating facilities and authorize the secretary to take action under both Medicare and Medicaid where there's a finding of a violation. But your friend gave a sensible reason why Congress might have wanted to treat the two types of claims differently, namely that Medicaid claims is a program that's granted more in state than Medicare. But in any event, Congress provided for one and not the other. And I guess I'm just trying to understand what specifically the basis is you're asking us to substitute our judgment for Congress's. Respectfully, Your Honor, the applicable statutes and regulations here create a situation where you don't need to substitute judgment. Cathedral Rock actually acknowledges that when you had a claim that was a pure Medicaid claim or a pure state Medicaid claim, the jurisdiction channeling or the claim channeling provisions in the Medicare Act wouldn't apply. But our argument, and undoubtedly the Medicaid Act doesn't have the same specific provisions, but the argument is still grounded in the statute insofar as particularly for duly participating facilities, there is no distinction between the Medicare Act and the Medicaid Act and what they require, the ways in which the secretary evaluates compliance with those requirements, and the ways in which the secretary can impose remedies or relief as a result of the violations of those requirements. For that reason, as a textual matter, notwithstanding the lack of similar language for 405 G and H, it's proper when you're talking about a duly participating facility and a claim that plainly straddles both the Medicare Act and the Medicaid Act to apply those claim channeling provisions consistent with 405 G and H. And Illinois Council's teaching that all claims arising under the Medicare Act must be challenged through the agency. Can I just ask one other question about sort of the origins of some of this case law, in particular the Michigan Association case from the Sixth Circuit and the health equity resources case from the Seventh Circuit? Your adversary argues that those cases were based on an earlier version of the Medicaid Act, and as I understand it, they're of questionable validity in light of that. Can you address that? Your Honor, to the extent that they're grounded in earlier versions of the Medicaid Act, it seems unclear at best to me why the principles that they enunciate would nonetheless govern here, particularly with respect to duly participating facilities and claims of this nature. Well, I guess the import would be to the extent that the statutory text may have changed, the reasoning now of those cases would rest on the policy considerations as opposed to the statute. Well, even to the extent that that's true, certainly in a case like Cathedral Rock, I don't believe that Council is arguing that Cathedral Rock arose under an earlier in time version of the Medicaid Act. And that's a case that expressly not only grounds its holding in the policy consideration, but also points to the statutory and regulatory overlap of the Medicare and Medicaid Act as reasons why, for duly participating facilities, the Medicare Act's claim channeling provisions apply. Okay, thank you. This is Judge Katzmann. Just to follow up so that I understand, with respect to the jurisdiction over Medicare Act claims, if you're right that the illegal composition of a survey team is not a basis for setting aside any of the penalties, why would a reviewing court ever reach the issue? And if it did, wouldn't it just be purely advisory? Your Honor, to play this out, if there were penalties that were imposed and the nursing center then came into court challenging those penalties, certainly at the administrative stage, HHS has suggested that the improper composition would not be sufficient ground for tampering with an otherwise valid finding. But I'm not sure why or how the district court would be bound by that same reasoning. If they were to find, if the district court were to find that as a matter of the plain language of the statute, as plaintiffs argue here, that whenever you have an investigation, you need to have a registered nurse on it, and that as a result, it was an improper agency action to impose the penalties that were imposed, without obviously prejudicing whatever some future hypothetical district court would do, it would seem that the district court could point to that as a ground for invalidating the finding, notwithstanding HHS's position at the administrative level that doing so would be inappropriate. On the Chevron deference, it seems somewhat strange for a court to defer to an agency about what the word subsection means. More specifically, can you give me your best authority supporting the notion that Congress intended to delegate interpretation of this word subsection to HHS? Your Honor, as I stand here today, I don't have authority for that proposition. Respectfully, I think that the government's arguments at Chevron step one don't solely turn on the definition of the word subsection, but to the extent that that is relevant, and we do think it's relevant, I don't think it's really a matter of interpretation. It's just kind of plain from the face of the statute and the different ways in which it uses the term subsection, and then with respect to G2, uses interchangeably subsection and paragraph, that the language of the statute is simply unclear. That's a finding that you can make without deferring to whatever HHS's interpretation of the term subsection would be. Our argument is not that subsection means some specific thing at all times, but that here subsection is used in different ways to refer to different parts of the hierarchy of the statute in such a way that it's not sufficient to say that the use of subsection in G2 applies across the board to all of the components of subsection G. That's particularly true, again, because G4 has different language about the composition of an investigation team. It allows for a level of flexibility in terms of the personnel that G2 does not necessarily do, and there's good reason for that, and I guess this bleeds into Chevron step two, which is that when you're talking about a specific complaint that triggers an investigation, that could be for a whole number of things, both medical and non-medical. What the states need is the flexibility to compose a team that's going to have the relevant expertise to carry out that investigation, and that's what G4 accomplishes. Finally, a question that I asked your adversary, if we were, hypothetically, and I'm not saying that we will, if we were to find jurisdiction over the Medicaid Act claims, would you agree, then, that we could review the regulation without reaching the issue of our jurisdiction under the Medicare Act? If the court were to find jurisdiction, I suspect, yes, Your Honor. I don't think there would be any barrier to that inquiry under the Medicaid Act. Thank you. Judge Laue? Thank you, Judge Kessman. Mr. Connolly, can you answer the more or less factual question that may only be available to HHS about the percentage of nursing facilities that qualify as duly participating facilities? Your Honor, I don't have those figures in front of me. If the court would like us to submit a letter providing the most up-to-date information that HHS has, I'm, of course, happy to do that promptly on the schedule the court would enter. Your Honor's percentage based on information from 2014, insofar as I have an understanding of this, it sounds right to me. In my understanding, it's certainly that most facilities are duly participating facilities. Right. So, it's right that if we were to adopt, for example, this Bright Line rule from procedural law, and I describe it as Bright Line, that would apply, then, to the vast majority of nursing facilities in service? It would apply to the vast majority of nursing facilities. I believe, again, that that would be correct. But it would, again, it would apply to claims that can be said to arise under the Medicare Act. Cathedral Rock itself acknowledges that, at times, there are going to be claims that are truly Medicaid claims. And it left open the possibility, and I think suggested as much, that the Medicare Act claim channeling provisions wouldn't apply in those circumstances. So, you could have a duly participating facility that files a purely Medicaid claim? Yes. I think that that's possible. Again, I mean, there's a substantial overlap between the Medicare Act and the Medicaid Act and the obligations that they impose. But there are instances where Medicaid, particularly with, like, state-specific legal issues or, you know, concerning individuals who are covered by Medicaid but not by Medicare. And in those circumstances, even with the Cathedral Rock rule in place, it would appear clear from Cathedral Rock's teachings and the other relevant case law that those claims would be able to proceed absent satisfaction of the claim channeling provision. And how would a court, and maybe this is a little too hypothetical, but how would a court assess whether it's a purely Medicaid claim as opposed to a claim that masquerades as a Medicaid claim but, in fact, in the context of a duly participating facility, a Medicare claim? Your Honor, I mean, I want to be careful just because I'm not necessarily, you know, sufficiently grounded in the intricacies of Medicaid to know when those types of claims might arise. Well, that's sort of a problem because much of this, it seems to me, relates to the unique features of the Medicaid program versus the Medicare program. You know, we've had a discussion about the providence or lack thereof of the jurisdiction stripping provisions in the state aspect of Medicaid. Right. Well, I mean, certainly there are provisions in Medicaid, and I don't have the specific provisions to hand right now, but there are provisions in Medicaid that deal with, you know, rules and obligations imposed by states or that deal with individuals who are covered by Medicaid but are not covered by Medicare. And those would be situations where a claim, it would be, even with a duly participating facility, I think that the outcome there would be that you're talking about a Medicaid claim. That's clearly not what's happening here because we're talking about statutes governing surveys and investigations that are applicable to both Medicare and Medicaid and that authorize the Secretary to take actions under both Medicare and Medicaid. Okay. So, and you heard my question to your adversary about this predominant test. Maybe it's not cleanly applied in the context of this case. But it falls shy of this right line test that was articulated in Confucial Rock. Do you have a, does the government have a view on this predominant test? Is it a viable test? Is it workable? In other words, Your Honor, just so I'm clear, the test would be whether a claim predominantly arises under Medicare or predominantly arises under Medicaid. Correct. So, suppose, for example, that a nursing facility consists mainly of Medicaid patients, 95% from Medicare, and the funding comes primarily from state-run Medicaid, and it imposes or files a challenge or whatever. Can we use a predominantly arises test in the context of that case-by-case, fact-specific test? Your Honor, I suspect it would be possible in some circumstances. What might make it difficult in terms of individual claims, and this is kind of, I guess, where your hypothetical crosses paths with the situation here, is that, again, when the Secretary undertakes surveys or investigates certain complaints, those arise under both Medicare and Medicaid, and they authorize the Secretary to take action to remedy problems and deficiencies under both Medicare and Medicaid. Well, Ken, if you had a nursing facility, let's say it's just 5% of the nursing facilities that are Medicaid-only, right, so they are not duly-participating facilities, those facilities could challenge the final rule in court under 1331. That's your view. If it's a purely Medicaid facility, they're not governed by the Medicare Act, so I don't see what the basis would be for applying the claim-channeling provisions there. But if it's a duly-participating facility and 1% of its funding comes from Medicaid, then it cannot challenge the final rule in court, the jurisdiction stripping provision, again. That's your view. And, Your Honor, forgive me, you said 1% came from Medicaid. Did you mean 1% came from Medicare? Medicare, yes. Your Honor, I think that would be the appropriate way to divide this, because at that point, you're talking about a facility whose rights and obligations are arising under both statutes, and who are going to be investigated and evaluated by the Secretary under both statutes and that are subject to final determinations of the Secretary under both statutes. Okay. Thank you. Mr. Feldman, you'll have two minutes. Thank you, Your Honor. Three quick points on the Medicaid Act. One is that Cathedral Rock simply follows the Sixth Circuit's controlling decision in Michigan Association. It's wrong for the same reason it relies on the old law that's obsolete and doesn't apply this circuit's clear statement doctrine. And second, and ultimately, there's no textual basis for any rule other than the one we propose for the Medicaid Act, because asking questions about whether facilities are duly eligible, whether the statutes are identical or predominant, are questions that are unanchored in the statutory text. I would note, though, however, for Judge Loyer, that the predominance test I submit, if you look at pages 7 and 8 in the brief, will usually come out on the Medicaid side, since Medicare only covers the first two months of a patient's resident stay, and Medicaid covers the entire long-term stay. Finally, keep in mind that there is not a parade of horribles, that under the Medicaid challenge, we are only talking about rulemaking. Administrative exhaustion will continue to apply as per the regulations and the statute. One note on Illinois Council, which is the government notably said, for I believe the first time ever, that a district court could and should set aside a survey result if the survey was illegal. If this court decides the Illinois Council question on that grounds, we respectfully ask that that be part of the holding so that the homes would have the benefit and the government cannot have its cake and eat it too. And finally, just to put this into context, we're living in a pandemic, and it's more important now than ever for nurses to be on surveys. As the Avon case illustrates, without registered nurses, assessing whether a home is compliant or finding a false negative, like there was with the Byrne and the Avon case, poses real risks. There, the corrective action, the remedy was worse than the disease, as the ALJ found on page 292 of the Joint Appendix. It was counterproductive and caused the residents to suffer. Even worse, if that happens today, that's why Congress held the government to the same professionalism standard as the homes, to have registered nurses. And the final rule directly contradicts the act. Judge Katzman, may I ask a question? Yes, of course. Mr. Feldman, I have two questions. You heard the government say that ultimately you could challenge, after going through the administrative process, an understanding that in the government's view, in your view, you can't get the relief at the administrative level. Are you challenging it after going through the administrative process in court? Sir, Your Honor, that is relevant only to the Medicare Act, Illinois Council argument. Again, if that is true, it should be part of the holding, so that actually could be set aside. That has not been the government's position to date, and we cite the government's position in the blue brief on page 21. In Rosewood, MS Healthcare, Jewish Home, the government has said repeatedly to other circuits, and one, that illegality in the survey process doesn't affect the outcome of 405G or CMP cause of action. So this would be a change in circuit, excuse me, in law throughout the country and in the government's position. It wouldn't affect the Medicaid Act challenge. This is no different than Illinois Council, where the Supreme Court said the Medicare Act challenge had to proceed through that process, because the facilities could test the legality of the rules, as the government suggests for the first time here under the Medicare Act. But the Medicaid Act challenge proceeded under the APA in 1331, as the Seventh Circuit held on remand, and that's what should happen here with the Medicaid Act. And if I might, I've got a second question about 42 CFR 498.4, which is the title of nursing facilities subject to administrative appeals process. What are we to make of that provision, which is not the subject of any challenge, which seems to acknowledge or set forth a theme as soon as which, if you are a dual participating facility, you've got to go through the administrative process, no matter what? We don't quibble with that, Your Honor. At most, what that means is the initial determinations that are reviewable, like survey results, are subject to normal procedures of finality, ripeness, exhaustion, by going to an ALJ and the Departmental Appeals Board, and may be subject to 405B and 405G judicial review. But what doesn't apply and what is the basis of this entire dispute under the Medicaid Act is 405H, and therein lies the difference. 405H does not strip Section 1331 jurisdiction over those questions. That's the state of the law in the Seventh Circuit. Under the health equity resources case, the nursing homes, Medicaid or Medicare, still must fully exhaust under those regulations you point to. However, under the Medicaid Act, where they're standing in a substantive basis, under Illinois Council on Remand, the Seventh Circuit has held that an APA challenge like this to rulemaking can also proceed outside of that limited agency review process. By remanding to the district court, you're saying they indicated that? Oh, I'm sorry. No, what I meant by that was that the Seventh Circuit made that as an alternate holding before Illinois Council was reviewed by the Supreme Court, and then reaffirmed that position at the Seventh Circuit upon remand from the Supreme Court. That's correct, Ron? Thank you. Thank you, Mr. Feldman. Thank you, Mr. Connolly, for your very strong advocacy. The court will reserve decision. We'll hear the next case on the calendar, United States v. Dickens and Cruz. Hello? Is Mr. Crushank? Your Honor, if it pleases the court, I couldn't tell if I was being called first. Thank you very much. This is Alan Crushank appearing for Gary Dickens. And then Ms. Schneider will come next. Thank you, Judge. Judge, Mr. Dickens takes the position that the plain error rule applies to both issues raised by him on appeal. Concerning the first, he requested that the court find that the superseding indictment that he was convicted under was impermissibly duplicitous. Based on the evidence of trial, there was no particular instance of either he, Mr. Cruz, his co-defendant, or any of the other co-defendant cooperative witnesses ever being in possession of a quantity of cocaine based in excess of 28 grams. We'd assert that the situation is one in which the court should have, or a motion should have, been directed to the superseding indictment concerning the aggregate weight argument that was being made by the government in their case. There was no evidence at trial that would have suggested that Mr. Dickens himself was personally responsible for an aggregate weight or an individual weight in excess of 28 grams. And the government's argument to that end was an effort to push Mr. Dickens into a sentencing range that would impose a higher sentencing category concerning Mr. Dickens. It's his position that that clearly prejudiced him, and he would ask that the court either reverse the case or remit the case for further proceedings. On the second argument... Judge, I will begin the questioning. Yes, Judge. What's your second argument? Judge, on the second argument, the government seems to take the position that the error argued in that situation is weighed. And it is one where the jury verdict form, when it was compiled, contained an inherent defect. That defect wasn't recognized by the court, wasn't recognized by the prosecutor, wasn't recognized by defense counsel at the time. The fact that it wasn't recognized does not mean that the error wasn't there. And the error was, one, in that question 1B concerning Mr. Dickens and question 2B concerning Mr. Cruz improperly suggested that the controlled substance that the jury had to consider must be cocaine-based. Was there ever any question, any real question, that cocaine-based was involved here? Judge, there was testimony by various witnesses as to the presence of cocaine-based in their possession. But there was also evidence throughout the course of the trial of other drugs being in various possessions of various of these co-defendants and cooperative witnesses. And that suggests that there were other drugs that the jury could have considered. When you say suggest in the context of a clean error analysis, which you conceded applies, that makes it even more difficult for us to identify error, it seems to me. Is there something more than suggest? There was testimony that other of the co-witnesses, I'm sorry, the cooperative witnesses were in possession, consuming and using drugs for their own purposes, which might not have been drugs that could be attributed to the conspiracy that was being alleged against Mr. Dickens and Mr. Cruz. Thank you, Judge Gaston. Judge Park. Just quickly following up on that, counsel, even if there were other drugs at issue, what's the confusion that's created in the jury verdict form? It just seems to me to be a compound question, and if either part is false, then the answer is no. But I don't see how that's confusing. I think what's confusing, Judge, is that I think it is a question for the jury as to whether or not there is cocaine base that is the foundation of the conspiracy. And when the question number one asks if there was a conspiracy involving the controlled substance, and then question number two suggests that the controlled substance was cocaine base, I think that takes away from the jury's role to decide whether or not cocaine base was in fact part of the conspiracy. Because the decision has been made for them or suggested to them by the trial court. OK, thank you. This is Judge Katzmann. Yes, Judge. My question is this. On your argument about the impermissible duplicitousness, why doesn't the argument founder on the essential ground that a conspiracy as charged in count one is a separate and distinct offense from the various substantive acts of possession with intent to distribute? Judge, I take your point concerning that argument, and the defendant's position would be one to the effect that he is asserting that he was never in direct possession of any of these, never found to be in direct possession of any of the alleged cocaine bases. And that there is no individual instance of him being in possession of more than 28 grams and that when there is no certainty that the aggregate weight claimed to have been possessed by each one of the individual co-conspirators or cooperative witnesses can be directly attributed to him. There should not be a finding that he can be attributed with an aggregate weight in excess of 28 grams. Thank you. Thank you. We will now hear from Ms. Schneider. Thank you. This is Tina Schneider. I represent Richard Cruz who was convicted of the drug conspiracy involving 28 grams or more of crack. I'm happy to waive the two minutes of protected time if the court would like to ask me questions before then. I'd like to focus as well on the issue of the jury verdict form, specifically that my client was denied his right to have the jury determine drug type. And I'd like to point out from the get-go that the government, in essence, concedes that this was error. It says it would have been preferable for the jury verdict form to first require the jury to identify the controlled substance involved. But it's not a question of preference. The defendant has a Fifth and a Sixth Amendment right to have the jury, not the judge, determine the drug type beyond a reasonable doubt because that fact increases the penalty for the crime. The government goes on to say, well, it's no big deal because crack was the only drug alleged to have been involved. But as Mr. Kirkshank pointed out, there was evidence of other drugs introduced at trial. And I'd like to point out it wasn't just evidence of witnesses or co-conspirators using other drugs. It was the dealing and trading of other drugs.  For example, Ms. Rosario testified about giving my client two Percocets. Tammy Phillips was paid with cocaine. She traded Percocets for cocaine. Carrie Polisky said that Mr. Dickens sold her both crack and cocaine, and she bought cocaine in bulk and sold it. So it's not just a theoretical possibility here. There was evidence that other drugs were involved in this conspiracy. And for the court to take that away from the jury was plain error. Judge Laillet? Ms. Schneider, thank you very much, Judge Kastner. Would you address whether or not the government's closing arguments mention these other drugs as being part of the object of the conspiracy? Or was the government's summation focused entirely on cocaine-based or crack cocaine? The government, as I recall, the government's closing argument was focused on crack cocaine. However, the argument of my client in closing did deal with those other drugs. My client argued in closing that about Tammy Phillips stealing Percocets, about Carrie Polisky's boyfriend distributing crack and cocaine, and specifically made the point that cocaine is not crack. So although the government was focused on crack cocaine, it was controverted at trial that that was the drug involved in the conspiracy. Thank you. Okay. The government also argued, and Judge Park, your earlier question alluded to this. If the jury didn't believe crack was involved, they could have just answered the conflated questions no. The problem with that is that saying someone conspired to distribute less than 28 grams of crack is a profoundly different thing than saying they did not conspire to distribute crack at all. And the jury was not given that option of saying no, it wasn't crack. The jury clearly found that my client was guilty of a drug conspiracy. But the next step, what was the drug involved in that conspiracy, was taken away from them. And as a result, Mr. Cruz is entitled to be resentenced under the default provision of the statute that has no mandatory minimum sentence. This is Judge Park. So if the form had said, put like a, you know, in brackets, number one before cocaine base and then number two before 28 grams, would that have addressed your concern here? I'm not sure I understand. Is your question about first asking the jury what drug was involved? Yeah, it seems like your complaint is that the question conflated two issues. And I guess my hypothetical is what if it had just identified that there were two issues by saying one and two? That would have been fine if the jury verdict form had said, if you find him guilty of the drug conspiracy, then tell me what drug was involved in the drug conspiracy. And the quantity of that drug was in more than 28 grams or less than 28 grams. That would have been fine because then the jury would have been determined. Well, I mean, I understand you would have liked a different form to say something different. But I guess my question is, what if we had just as written added number one and number two in front of the two parts of the question to break out that it was compound? Would that have been enough? Number two. I guess I'm not understanding your question. I'm sorry. If it had said number one was crack cocaine involved and number two. Is that what you mean? I'm sorry. I just. I'm not understanding what you're asking. It's a hypothetical, so let it go. I was just curious what sort of what the trying to push the where what your specific complaint was, but that's fine. Well, the complaint is that the question about drug, what type of drug was just skipped over if the verdict form had said, what's the type of drug? Or even if it said was crack cocaine. You know, one of the drugs involved would be in a different position here. But thank you. Yeah. Judge Katzmann, and I just have really essentially one question. Schneider. My question is for really two questions related. What what particular challenges could you have mounted to the use of your prior conviction? Given that, as I understand it, you're and correct me if I'm wrong, you're precluded under section 851 E from challenging its validity since it occurred. And five years ago, and you didn't object to the description of that conviction or the facts underlying it in the pre sentence report. Yes, so we had no incentive to object to anything in the pre sentence report because Mr. Cruz's sentence was driven entirely by the fact that there was a mandatory minimum here. So, the fact that he didn't object or challenge the prior in the is really not compelling here. And you're correct that after a certain period of time, you can challenge the validity of a prior conviction. You can, however, challenge any fact in that prior conviction. So, you could say, well, if there's no, I'm sorry, go ahead. Finish your sentence. I was just going to say, if it doesn't fit within the definition, you could challenge it on that basis. If it's not really you, you could challenge it on that basis. The problem here is because the court didn't ask the questions it was required to by statute. We don't know what my client would have alleged. Well, but that then leads to the question. If there were no specific challenges that you were prohibited from raising, how are you prejudiced by the district courts not following the procedures in Section 851? Well, we don't know whether there were specific things Mr. Cruz could have challenged because this colloquy was never conducted. And so, he never had the opportunity to say to the court, oh, I do challenge that prior conviction and I want to put the government to its proof. And he never had the opportunity to consult with his lawyer below and discuss what the parameters were for challenging a prior under 851. And so, the record necessarily doesn't include any of that. And it should be sent back. This is Judge Loyer. That doesn't answer the prejudice question that Judge Katzinger posed. So, we don't know if it's prejudicial because. Those are two very different answers. That's correct. But here's the problem is that because the judge didn't engage in the colloquy, the record necessarily doesn't have anything about this. So, we can show prejudice. But in that case, if you said, well, you need to show prejudice in this circumstance, then there would be absolutely no remedy when a judge failed to engage in the statutorily required colloquy about the prior conviction, use of the prior conviction. Thank you. We will now hear from Mr. Silver. Thank you, Your Honors. With respect to the verdict form, I do maintain the government maintains that the objection to it is waived. This is not a case where the court used the verdict form and nobody raised an objection, which would result in a plain error analysis. This is a situation where the court had a conference with counsel, both counsel and government counsel, and part of that conference was directed to formulating this verdict form, particularly with respect to the issue that's being challenged when a problem with its formulation was raised by government counsel. And both counsel participated in the new formulation of the verdict form, as well as indicating that neither had an objection to it as changed. So, we do think it's waived to the extent the court will apply plain error analysis to to any defect that might see in the verdict form. I think it's telling, first of all, that something as basic as what drug was involved in the conspiracy, that question didn't occur to anybody in the formulation of the verdict form, because there really was only one drug charged in this conspiracy. Also, the defendants don't challenge on appeal the sufficiency of the evidence against them. So, no one is saying that the evidence didn't establish that more than 28 grams of cocaine base was involved in the conspiracy. To that extent, if there were other drugs involved in the conspiracy, which is a point the government does not concede, it would not have affected the sentence that either of these defendants faced. So, they don't challenge the jury's answer to the first question. Yes, they were involved in a drug conspiracy. And they don't challenge on appeal here the fact that the proof established they were involved with more than 28 grams of crack cocaine. I have no questions. Judge Park. Thank you. Just just briefly, your adversaries talked about evidence of other drugs that was presented at trial, and I was just wondering if you could address that. There was evidence of other drugs at trial. It's not clear to me, and I don't maintain that those drugs were part of this conspiracy. Particularly because in this conspiracy, Cruz was the source of supply, and all he supplied was cocaine base. No powder cocaine, whether people were using or distributing Percocets has nothing to do with the conspiracy that was charged here. So, yes, there was evidence of other drugs. I do believe there's also evidence that cocaine, powder cocaine was given by Cruz to at least one other individual. So, a distribution, but that appears not to be a part of the conspiracy that was charged here. He could not have gotten that powder cocaine, at least as far as the evidence is concerned, to trial from Cruz, because all the Cruz provided was cocaine based. So, yes, I don't contest that there's evidence of other drugs involved. Most of it is distributed by people other than Cruz, excuse me, other than Dickens. But I do believe Dickens, at least on one occasion, provided powder cocaine, maybe two or three occasions. So, no argument there. Okay, thank you. Yeah, but as I say, it was not prejudicial to the defendants on the circumstances of this case, because they don't concede, they don't contest that they were involved in a drug conspiracy, and they don't contest that that conspiracy involved at least 28 grams of crack cocaine. With respect to the discussion about challenging the felony conviction relied upon to enhance Cruz's sentence. Obviously, we concede the district court did not follow the procedure it should have. But I think it's a matter of bread and butter practice routine in a multitude of criminal prosecutions, where prior convictions are challenged, whether they are used to enhance the statutory minimum or not. There was nothing about the procedures that occurred in the district court that prevented Cruz from raising an objection if he had one. And in that respect, I disagree with Ms. Schneider about it's not compelling that Cruz raised no objection to the pre-sentence report with respect to the prior conviction. I would also analogize to challenges to plea colloquies, where a judge doesn't ask a question necessitated by Rule 11. And nonetheless, the defendant still has to show prejudice. And the prejudice in that context is I would have not entered my guilty plea. And this is similar. And the mere fact that the judge didn't ask the question did nothing to preclude the defendant from raising an objection. And certainly the fact that no objection is raised at this time to the prior conviction shows that Cruz has not established that prejudice under plain error review. Unless the court has any other questions, I'm happy to rely on my papers. Judge Gaston, just one hypothetical question. If we were to differ with you as to your view that the defendants waived their challenge to the jury verdict form, would you still have grounds to affirm the district court on this issue? Well, I would say that if it hasn't been waived, then review is for plain error. And the defendants concede review is for plain error. Under the facts of this case, if there was error, which we don't concede, but if there was error, it was not plain because the only drug alleged to have been involved in the conspiracy was cocaine-based. And there was no prejudice to the defendants under plain error review because they concede that the jury correctly determined they were involved in a drug conspiracy, and they're only arguing about which drug, which is a sentencing matter. They don't challenge the evidence establishing their involvement in more than 28 grams of crack cocaine, which drove the sentence here. Even if there were other drugs involved, it would not have affected the sentence. And finally, in light of the way the case was charged and everyone approached it, the defendants can establish that this affects the fairness, integrity, or public reputation of the proceedings below. So they fall woefully short of establishing plain error. Thank you. Thank Mr. Silver, Mr. Cushank, and Ms. Schneider. The court will reserve decision. We'll hear the next case on the calendar, Skorik v. Commissioner of Social Security. Mr. Skorik, can you hear me? Yes, I can hear you. So you will have, to begin with, two minutes of uninterrupted argument. Then the judges will each ask you a question. You will have one minute rebuttal after Mr. Moskowitz does his argument. Do you understand that? Yes. Okay. Thank you, sir. Please proceed. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you very much. As such, this currently proves that I'm okay and that I'm not living with disability. Indeed, for close to a decade, I am unable to walk effectively or block at a reasonable pace on rough or uneven surfaces, limping, dragging my legs, at the clumsy, like a ball and chain. And this is nothing new. This is not a later acquired disability or the subsequent deterioration of a previously known disabling condition. This is just the continuation and subsequent deterioration of conditions I complained about in my original disability case eight years ago. Yet, instead of an apology, I have to suffer commissioners' innuendo that a life-changing event like the knee replacement surgery, the corroborating evidence of which is easy to confirm by communicating with contacts with defendants already have on record in this case, simply did not happen. The only truth. Yeah. Mr. Skorek, this is Judge Katzmann. I have a couple of questions for you, please. You say in your brief that your physical and mental health has worsened since your disability claim was denied. That's correct. You said, as you say here, for instance, that you've begun suffering from hip osteoarthritis, bipolar disorder, and possibly a vascular necrosis. Could you tell me when you were diagnosed with these conditions? Okay. The mental diagnosis happened in December 2017, and with the knee problems, I'm suffering since before the case started. And eventually, the total knee replacement surgery was done in December 2017. And the hip happened later. And actually, I had a total hip replacement done this summer, a month and a half ago. So I am still right now recovering from the total hip replacement. So the hip problem, was that identified at the time that the ALJ denied your claim? No. The hip problem is the only one that came after that. The other problems that you mentioned, in other words, you're saying existed at the time that the ALJ denied your claim? Exactly. And for example, let's see about this mental thing. The disparaging remarks related to my mental health records and diagnosis, claiming the report is not material because it is dated after the ALJ's decision, and it is not probative because it is not accompanied by treatment notes, and that under applicable regulations, it cannot establish the presence of an impairment because it is signed by an APRN, the colossal failure of the U.S. healthcare system. And in particular, it's treatment of mental health. In my county, where I live in Vermont, there is only one psychiatrist who is seeing Medicaid patients. The appointments are at three to four-month intervals and last half an hour, half of which are spent on the nurse measuring temperature, taking blood pressure, and heart rate, and going through the medication list. Treatment notes are think of the past, together with unionized labor, livable wages, and single-earner households. For the record, due to that abysmal situation, about 80% of mental health prescriptions paid by Medicaid are today signed by APRN. And the entire mental health business in the U.S. is reduced to adjusting medication to haphazardly self-diagnose patients. This, sure, is not ideal, but should not be used against the plaintiff, since it is outside his control. The functional assessment was regrettably never ordered, neither by the ALJ nor by the district court. On the other hand, it is well established by science today that mental impairments can go on undiagnosed and untreated for a long time. Mr. Skorik, I'd like to turn to Judge Loyer. Do you have any questions? No. No, thank you, Judge Kessling. But I appreciate the argument very much, Mr. Skorik. Thank you. Judge Park? No questions. Thank you. You will have, Mr. Skorik, one minute in rebuttal after counsel for the appellee speaks. And I understand that the counsel is Benno Abraham. Sorry for the confusion. Appellee counsel, please proceed. Thank you, Your Honor. And good morning to all. May it please the Court. This is Benno Abraham, appearing on behalf of the Commissioner of Social Security. Mr. Skorik has failed to meet his burden of showing that he had a medically determinable mental impairment during the relevant period. As we discussed in the brief, there's no psychiatric diagnosis from an acceptable medical source, which the regulations require. ALJ's finding on this issue is supported by Dr. Mooney's opinion that Mr. Skorik had no cognitive or psychiatric diagnosis. Dr. Mooney stated in no uncertain terms that Mr. Skorik did not have mental illness that affected his ability to function. The Step 2 finding is also supported by the lack of evidence of psychiatric treatment or medication during the relevant period. Importantly, despite the lack of evidence of a mental impairment, considering Mr. Skorik's complaints, the ALJ here included mental limitations in the residual functional capacity. And on this issue of record development, the ALJ adequately and properly developed a record with regard to his alleged mental health treatment. There were multiple requests sent to Mr. Eggner, who I believe was a therapist, but the agency received no response. Similarly, a request for records and a medical opinion were sent to Dr. Kassner, who also did not respond. Dr. Kassner was not a treating source, but rather Mr. Skorik saw him in order to obtain an opinion to refute Dr. Mooney's assessment. And notably, according to Mr. Skorik's description, Dr. Kassner was of the opinion that Mr. Skorik could work as a bartender. Therefore, even this doctor, from whom Mr. Skorik sought a contrary opinion, believed that he could in fact work and was not disabled. And the last point on the development issue, the regulations allow an ALJ to order a complicated examination in order to develop a record. And that's exactly what the ALJ did here, and we have the reasoned opinion of Dr. Mooney. Secondly, I would quickly note and state respectfully to the court that the residual functional capacity is supported by substantial evidence. In this case, we have two medical opinions. One is from Dr. White, a state agency review physician, and then we have an opinion from Dr. Fuchs, a board-certified orthopedic surgeon. Both of these opinions support the residual functional capacity. And particularly, as an orthopedic specialist, Dr. Fuchs was well suited to assess Mr. Skorik's functional limitations arising from his impairment. This is Judge Katzmann. Just a question. With respect to evidence of new impairments, that is, since the ALJ denied the claim, if there are new impairments that have arisen, wouldn't somebody in Mr. Skorik's position be able to file a subsequent claim for benefit for a later period? Yes, Your Honor, that's exactly correct. With regard to the subsequent impairments, Mr. Skorik would be able to file another claim for benefit. And in fact, agency records indicate that he has indeed filed a subsequent application. Thank you. Judge Loyer? I have no questions. Thank you, Judge Katzmann. Judge Parikh? No questions. Thank you. Mr. Skorik, you will have one minute for rebuttal. Yeah. Hi. Thank you. So, yes, this is exactly what I am saying about the unending merry-go-round, because I have my arguments and Mr. Abraham has his arguments, and we are just repeating this over and over again. And, yes, it is right that under the advice of one guy who is working as a lawyer here in this country, I actually did file another claim a year ago that included the HIP and the new medical health diagnosis. And, yes, the thing is that we know that it takes a long time to get diagnosis for the mental impairment, so this is the reason why it was not available at the moment. But what I actually want to add here in my rebuttal is it would be absolutely absurd to claim that the commissioner does not need to consider my current skills when assessing my ability to perform my past element work. And this is precisely what every employer would first consider. And also that the commissioner does not need to consider even whether that past work still exists in the national economy. How could that work? How can the claimant seek and get a job that does not exist anymore or for which he does not have the required skills anymore? This is like asking people twice. And the commissioner also claims that he is not required to establish the existence of a job that the claimant could perform. Could you finish your thought? Your one minute has expired. Yes. I'm just talking about the residual functional capacity because Mr. Abrahamson says that at the location in the state where the claimant lives, it is preposterous nonsense. What if the claimant cannot adjust to moving elsewhere, cannot leave the family, his support network, his doctors? What if he has an underwater home that he cannot sell and has neither resources to establish resident health nor physical and mental health necessary to sustain a long distance move? How can those things not play a role in the commissioner's decision that the claimant can work jobs that exist in national economy that don't exist within like 100 miles away from his home? This is my question. Thank you. Thank you. Thank you, Mr. Skorek. Thank you, Mr. Abraham. The court will reserve decision. That is our final argument. The clerk will adjourn court. Court stands adjourned.